*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

In re ESTATE OF MARTIN LANGER.

---

ELISE LANGER, Personal Representative of the
Estate of MARTIN LANGER,

　　　　　　Appellee,

v

THERESA VERTALKA,

　　　　　　Appellant.

UNPUBLISHED
June 11, 2019

No. 342816
Macomb Probate Court
LC No. 2016-222157-CZ

---

Before: SAWYER, P.J., and O'BRIEN and LETICA, JJ.

PER CURIAM.

　　Appellant, Theresa Vertalka, appeals as of right an order directing Comerica Bank to release to appellee, Elise Langer,[1] as personal representative for the estate of Martin Langer, funds from accounts originally held by decedent, Martin Langer. We affirm.

　　On June 3, 2016, Martin met with several family members for the purpose of preparing a last will and testament. In addition to Martin, the meeting was attended by John Langer (Martin's brother), Paul Langer (John's son), Elise (John's daughter), and Theresa (the daughter of Martin's sister). John procured a last will and testament from the internet, and Elise completed the fill-in-the-blank form according to Martin's instructions. In pertinent part, the will provided that Martin's real and personal property was to be divided equally among Martin's three siblings. After completing the will, the group went to Comerica Bank so Martin could execute his will before a notary. Martin and Theresa also signed new signature cards for each of six accounts Martin maintained at Comerica. According to Comerica, execution of the signature

---

[1] We use the term appellee when referring to Elise in her capacity as personal representative for the estate, but will otherwise refer to Elise by name.

cards by Martin and Theresa established both of them as co-owners of the accounts, which collectively contained approximately $680,000. Martin passed away approximately four months later. At the heart of this appeal is whether Martin intended to gift the Comerica accounts to Theresa by adding her as a co-owner or whether Martin intended the accounts to be distributed as part of his estate.

This matter proceeded to a bench trial, at which the witnesses generally agreed that Martin and Theresa were close to one another, that Theresa was helpful to Martin in the final years of his life, and that Martin was extremely frugal. The witnesses also agreed that Martin wished to favor Theresa above his other nieces and nephews in the distribution of his estate. They disagreed, however, about how Martin intended to favor Theresa. According to Elise, John, and Paul, Martin decided to give monetary inter vivos gifts to each of his nieces and nephews in lieu of including them in his will. They testified that Martin decided to give $5,000 to each of two nephews who had also provided him with various assistance and $14,000 to Theresa, which Elise explained was "the maximum amount" Martin could give without having to file a gift tax return. Theresa's husband, the only nonblood relative to receive a gift, was also given $14,000. Martin's remaining nieces and nephews each received $1,000. In contrast, Theresa testified that these amounts were not determined by Martin, but rather by John and Elise. Theresa recalled a conversation in which Martin discussed giving her money when he died, and she believed he intended to give her "a lot more" than $28,000.

Elise, John, and Paul also agreed that a financial power of attorney was discussed at the June 3, 2016 meeting. They recalled that Martin intended to designate Theresa—who had already been helping Martin with his finances by preparing checks for him to sign—as his attorney-in-fact, but Theresa was hesitant to accept the appointment without first consulting with an attorney. As a result of Theresa's hesitation, John suggested that Martin add Theresa to his bank accounts as a "convenience signer," which, according to John, would have the same effect of giving Theresa authority to sign checks on Martin's behalf. Elise opined that if Theresa had agreed to the financial power of attorney on June 3, 2016, Theresa would not have been added to Martin's bank accounts. John testified that he told the bank employee that Martin wanted a "convenience account."[2]

Theresa explained that she was designated as Martin's attorney-in-fact in August 2016, but did not remember if the idea was first presented in June or whether she wanted to have the documents reviewed by an attorney. She further testified that Martin told the bank employee to put Theresa's name on his accounts and did not refer to a convenience signer, nor did Theresa recall anyone else telling the employee that the change was intended for convenience only. Theresa acknowledged that she did not realize Martin was making her a co-owner of the accounts at the time.

---

[2] Elise and Paul were not in the Comerica conference room when this discussion purportedly took place.

Jessica Endres, the assistant manager who helped Martin on June 3, 2016, recalled telling Martin that by signing replacement signature cards with Theresa, he would be adding her as a joint owner of the accounts. Endres testified that no one used the term "convenience signer" during the transactions at the bank, and she did not believe that Comerica offered convenience accounts or convenience signers. Had there been any suggestion that Martin only wanted to give Theresa the ability to write checks on his behalf, Endres would have suggested a power of attorney.

The trial court noted that a presumption exists under MCL 487.703 that title to funds held in a joint account with the right of survivorship is intended to vest in the surviving joint owner, but that the presumption could be overcome by reasonably clear and persuasive evidence of a contrary intent. The trial court made detailed findings of fact concerning the evidence presented and concluded that Martin did not intend to convey an ownership interest to Theresa when he added her to his Comerica accounts. Accordingly, the trial court entered an order directing Comerica to release the funds from Martin's accounts to appellee.

Theresa argues that the probate court erred by concluding that appellee rebutted the presumption of ownership that arises under MCL 487.703. We review a probate court's factual findings for clear error. *In re Raymond Estate*, 483 Mich 48, 53; 764 NW2d 1 (2009). "A finding is clearly erroneous when a reviewing court is left with a definite and firm conviction that a mistake has been made, even if there is evidence to support the finding." *In re Bennett Estate*, 255 Mich App 545, 549; 662 NW2d 772 (2003). "The reviewing court will defer to the probate court on matters of credibility, and will give broad deference to findings made by the probate court because of its unique vantage point regarding witnesses, their testimony, and other influencing factors not readily available to the reviewing court." *In re Duke Estate*, 312 Mich App 574, 581; 887 NW2d 1 (2015) (quotation marks and citation omitted). See also MCR 2.613(C) ("[R]egard shall be given to the special opportunity of the trial court to judge the credibility of the witnesses who appeared before it."). Contract interpretation is a question of law that this Court reviews de novo. *Meemic Ins Co v Bischer*, 323 Mich App 153, 157; 915 NW2d 1 (2018).

"In Michigan the vesting of title to funds in another by the creation of a joint bank account with right of survivorship is a statutory method of transfer of title." *Jacques v Jacques*, 352 Mich 127, 134; 89 NW2d 451 (1958). MCL 487.703 provides:

> When a deposit shall be made, in any bank by any person in the name of such depositor or any other person, and in form to be paid to either or the survivor of them, such deposits thereupon and any additions thereto, made by either of such persons, upon the making thereof, shall become the property of such persons as joint tenants, and the same together with all interest thereon, shall be held for the exclusive use of the persons so named and may be paid to either during the lifetime of both, or to the survivor after the death of 1 of them, and such payment and the receipt or acquittance of the same to whom such payment is made shall be a valid and sufficient release and discharge to said banking institution for all payments made on account of such deposits prior to the receipt by said bank of notice in writing not to pay such deposit in accordance with the terms thereof.

When a deposit has been made, or shall hereafter be made, in any banking institution transacting business in this state, in the names of 2 or more persons, payable to either or the survivor or survivors, such deposit or any part thereof or any interest or dividend thereon and any additions thereto, made by any 1 of the said persons, shall become the property of such persons as joint tenants, and the same shall be held for the exclusive use of the persons so named and may be paid to any 1 of said persons during the lifetime of said persons or to the survivor or survivors after the death of 1 of them, and such payment and the receipt or acquittance of the same to whom such payment is made shall be a valid and sufficient release and discharge to said banking institution for all payments made on account of such deposits prior to the receipt by said bank of notice in writing not to pay such deposit in accordance with the terms thereof.

The statute further provides that "[t]he making of the deposit in such form shall, in the absence of fraud or undue influence, be prima facie evidence . . . of the intention of such depositors to vest title to such deposit and the additions thereto in such survivor or survivors." *Id*.

When "the statutory provision that deposits of the character here involved 'become the property of' the survivor" applies, the party challenging the survivor's title must present "[r]easonably clear and persuasive proof" that survivorship rights were not intended. *Lau v Lau*, 304 Mich 218, 224; 7 NW2d 278 (1943). Evidence that the decedent intended a co-owner to use joint account funds only for the benefit of the decedent during his or her life does not necessarily negate the presumption[3] that the decedent intended the account to pass to the surviving co-owner after the decedent's death. *Kirilloff v Glinisty*, 375 Mich 586, 589; 134 NW2d 707 (1965).

Although the parties primarily focus on reinforcing and rebutting the presumption that Theresa possessed a right of survivorship in the subject accounts, appellee alternatively argues that the Comerica accounts are not the type of joint accounts contemplated by MCL 487.703. In order for MCL 487.703 to apply, the deposits in a joint account must made "in the name of such depositor or any other person, and in form to be paid to either or the survivor of them," or "in the names of 2 or more persons, payable to either or the survivor or survivors[.]" MCL 487.703. See also *Leib v Genesee Merchants Bank & Trust Co*, 371 Mich 89, 93-94; 123 NW2d 140 (1963) (finding that joint account holder was not entitled to statutory presumption where instrument establishing account did not contain necessary survivorship language); *Peoples State Bank of Belleville v Allstaedt*, 301 Mich 662, 664; 4 NW2d 48 (1942) ("[T]he letter

---

[3] Despite the frequent use of the term "statutory presumption" in caselaw concerning MCL 487.703, the statute actually refers to the creation of such accounts as " '*prima facie evidence . . . of the intention of such depositors to vest title . . . .*' " *Jacques*, 352 Mich at 135, quoting MCL 487.703 (emphasis added). See also *Kirilloff v Glinisty*, 375 Mich 586, 588-589; 134 NW2d 707 (1965) ("[E]ven though facts might be introduced tending to controvert the presumed fact, the presumed fact nonetheless remains as at least a permissible inference for the trier of fact.").

accomplished the purpose of making the account joint, to the extent of being payable to either, [but] it did not, under the statute, making the account payable to the survivor.").

According to Endres, two documents form the contractual relationship between Comerica and its customer: the signature card and the business and personal deposit account contract (Account Contract). In relevant part, § 2.06 of the Account Contract provides: "Each joint Owner agrees, unless otherwise indicated on the Signature Card for the Account, that all money in the Account may be paid to or on the order of any Owner, either before or after the death of any Owner." Further, § 1.48 defines the term "owner" as "any of the persons or entities who are designated in the Account Registration section of the Signature Card for the Account as a legal owner of the Account." The signature cards signed on June 3, 2016, identify both Martin and Theresa under the account registration sections. Accordingly, they were both considered owners of the joint accounts. And while the Account Contract does not use the precise survivorship language of the statute, it clearly conveys the same intent, i.e., that upon the death of a co-owner, the funds are payable to the surviving co-owner. The probate court, therefore, did not err by applying the statutory inference mandated by MCL 487.703.

In *Kirilloff*, 375 Mich at 590, in addition to the permissible inference embodied in the statutory presumption, the evidence showed that the decedent

> was of unchallenged competency, owned her own home, supported herself by her own labor, had long maintained a savings account in defendant bank, sought, the day after having talked with an attorney, to change the nature of that account, was specifically informed by [a manager] of the incidents of a joint and survivor account, signed a document detailing those incidents, and maintained the account unchanged until her death three years later.

However, the bank manager testified that the decedent told him she opened the joint account "to provide access to the funds in the event of her illness." *Id*. at 589. The manager also recalled the decedent saying, " 'In case anything happens to me, I want that money divided four ways.' " *Id*. at 590. Thus, "[o]ne could infer . . . that despite the explanation given [the decedent] about the incidents of a joint and survivor account she nonetheless intended that the funds on deposit at her death be divided among her four children." *Id*. at 591. "Faced with two conflicting inferences, the chancellor chose to draw the one supported by the statutory presumption . . . ." *Id*. Recognizing the clearly erroneous standard of review, the Supreme Court affirmed the ruling, reasoning:

> [A]lthough [the manager's] testimony removed the presumed fact from the realm of a mandatory inference, it still remained as a permissive inference. Thus, even if it be believed that [the decedent] said she wanted the account's funds divided among her four children, by opening the joint account in the names of defendants only soon after consulting with an attorney and just after the incidents of joint accounts had been explained to her, and maintaining it in face of repeated explanations of those incidents, her actions were such that the chancellor was entitled to infer, in harmony with the statutory presumption, that she intended that only defendants were to have title to the account funds in the event of her death. [*Id*. at 591-592 (footnote omitted).]

The probate court in this case was similarly faced with two conflicting, but permissible, inferences. On the one hand, Martin added Theresa as a co-owner to six bank accounts that had associated rights of survivorship. As a matter of law, Martin's actions constituted prima facie evidence of his intent to vest title in the accounts to Theresa. MCL 487.703; *Jacques*, 352 Mich at 135-136. Evidence also demonstrated that Martin and Theresa shared a close relationship and that Martin's desire was to favor Theresa above his other nieces and nephews in the distribution of his assets. And, as Theresa emphasizes on appeal, the mere fact that Martin may not have intended to give Theresa unfettered discretion to immediately use the account funds as she wished is not necessarily inconsistent with the presumption that he intended to give her the balance of the accounts after his death. *Kirilloff*, 375 Mich at 589.

On the other hand, as the probate court observed, there was ample evidence that Martin wanted Theresa to serve as his attorney-in-fact for financial matters and that Theresa was only added to Martin's Comerica accounts after she was reluctant to accept the appointment on June 3, 2016. Further, it was John, rather than Martin, that recommended adding Theresa as a "convenience signer," and there is no evidence to suggest that Martin would have independently taken that action but for John's suggestion. While Comerica and its representative, Endres, understood the transaction as conveying ownership rights to Theresa, it is unclear that Martin fully understood the significance of his actions on June 3, 2016. Even if the probate court credited Endres's assertion that she verbally explained the resulting joint ownership to Martin, the only documents presented to Martin at the time were signature cards that referred only to "authorized signers" rather than "owners."[4]

The probate court, sitting as the fact-finder and faced with conflicting inferences arising from the evidence, determined that appellee had adequately rebutted the presumption of joint ownership with rights of survivorship with evidence that Martin did not intend that result. Having reviewed the record, we are not left with a definite and firm conviction that a mistake was made. The probate court's findings were supported by competent evidence and largely turned on credibility determinations that are entitled to deference in light of the probate court's superior ability to assess the witnesses who appeared before it. MCR 2.613(C); *In re Duke Estate*, 312 Mich App at 581.

Indeed, it appears that the probate court reached the correct result. While the evidence and competing inferences are comparable to *Kirilloff*—namely, an overt act by the decedent creating a joint account with rights of survivorship, weighed against evidence of a contrary testamentary intent, see *Kirilloff*, 375 Mich at 589-591—the distinguishing facts involved in this case are significant. For instance, the decedent in *Kirlilloff* consulted with an attorney the day before opening the subject account. *Id*. at 589. Martin, however, did not seek independent counsel and was advised only by his family. Although Theresa did not recall Martin referring to a "convenience account," Elise, John, and Paul agreed that the matter was discussed before the

---

[4] According to Endres, the Account Contract is only provided to customers when a new account is opened or when there is a change of registration involving a person who was not already a Comerica customer.

group went to the bank, and all three witnesses believed that Theresa could be added as a "convenience signer" without conveying an ownership interest.  Because Martin decided to take this course of action only after it was suggested by John, it is reasonable to conclude that Martin may have mistakenly understood the ramifications of his decision to be consistent with what was explained to him by his family.  And, despite the Endres's testimony, Theresa herself acknowledged that she did not realize Martin was making her a co-owner of the accounts.  Furthermore, the documents signed by the decedent in *Kirilloff* explicitly stated that the funds in the account were " 'the property of the undersigned, as joint tenants, and shall be payable to either of [sic] the survivors in accordance with the laws of the State of Michigan.' "  *Id*. (alteration in original).  The signature cards executed by Martin and Theresa merely referred to account registration, customer information, and authorized signers, without indicating to whom the funds belonged.

The probate court's findings are further supported by the fact that Theresa and her husband received inter vivos gifts that totaled more than twice the collective amount Martin left to his 16 other nieces and nephews.  Thus, the probate court could reasonably infer that an additional conveyance of $680,000 in account funds was both excessive and unnecessary to satisfy Martin's intent to favor Theresa in the distribution of his assets.  Given the totality of the circumstances, the probate court did not clearly err by finding reasonably clear and persuasive proof rebutting the statutory inference that Martin intended to vest title to the bank accounts in Theresa.

Affirmed.  Having prevailed in full, appellee may tax costs.  MCR 7.219.



/s/ David H. Sawyer
/s/ Colleen A. O'Brien
/s/ Anica Letica